# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MUMTAZ MERCHANT, )
)
       Plaintiff, )
)     Case No. 13 C 3848
    v. )
)     Judge Joan H. Lefkow
METROPOLITAN LIFE INSURANCE CO., )
)
       Defendant. )

## OPINION AND ORDER

Plaintiff Mumtaz Merchant filed suit against the employee welfare benefit plan ("the

Plan") provided by his former employer, International Business Machines Corporation ("IBM"),

and its insurer, Metropolitan Life Insurance Company ("MetLife"). Merchant seeks payment of

benefits under the Plan pursuant to section 502(a) of the Employee Retirement Income Security

Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). After Merchant voluntarily dismissed defendant

IBM Long-Term Disability Plan (dkt. 3), the parties filed cross motions for summary judgment

(dkts. 27, 30). For the following reasons, Merchant's motion is granted and MetLife's motion is

denied.[1]

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242,

---

[1] The court's jurisdiction is based on sections 502(e)(1) and (2) of ERISA, as amended, 29 U.S.C. §§ 1132(e)(1) and (2); and 28 U.S.C. § 1331. Venue is proper pursuant to section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391(a) and (b).

248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). When considering cross-motions for summary judgment, the court must be careful to draw reasonable inferences in the correct direction. *See, e.g., Int'l Bhd. of Elec. Workers, Local 176* v. *Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id*. at 323. In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

# BACKGROUND[2]

## I.      Merchant's Job At IBM

### A.      Job Duties

Merchant, a resident of Glendale Heights, Illinois, joined IBM as a configuration

manager in its Dubuque, Iowa office on November 15, 2010.  Merchant's line manager, Daniel

Carriker, described Merchant's job responsibilities as follows:

> Role: Guide and direct the success of Application scans of remote devices.
> Tasks: Strictly a desk type of job.  Office desk and Office chair.
> > No lifting involved beyond standard desk work (phone etc.)
> > Does not require remaining at desk 100%.  Short walks can be allowed[.]
> > Approximately 10-30% time on the phone resolving problems.
> > Objective:  resolve  problems  related  to  scanning  issues  via  laptop  use.
> > Most tasks revolve around using laptop for analysis or research.
> > > Logging into servers[.]
> > > Monitoring Console results[.]
> > > Verifying logs[.]
> > > etc.[3]

(Administrative Record ("R.") 967.)  Carriker also described the position as requiring Merchant

to sit for seven to eight hours per day, stand for one to two hours, and occasionally carry up to

ten pounds.  (*Id.* 958.)  Carriker further noted that Merchant's position did not require any

driving or travel, but that Merchant could not work from home and that his job could not be

modified.  (*Id.* 957-58.)

---

[2] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1.  In considering each motion for summary judgment, they are taken in the light most favorable to the non-movant.  In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to the resolution of these motions.  Any facts submitted that are not controverted as required by Rule 56.1 are deemed admitted.  *See* L.R. 56.1(a); *see also*, *e.g.*, *Collins* v. *United States*, 894 F. Supp. 2d 1051, 1055 (N.D. Ill. 2012).

[3] There is confusion about the exact nature of Merchant's tasks.  The administrative record contains the job description for a different position at IBM, "Entry Loan Administrator," and Merchant uses that description to explain his job tasks.  (Dkt. 29 ("Pl. 56.1") ¶ 2.)  It is undisputed, however, that he was employed as a configuration manager and not as an entry loan administrator.  (*Id.* ¶ 1.)

### B. Job Benefits

Merchant enrolled in IBM's disability insurance programs insured by MetLife. In particular, Merchant was a participant in IBM's 401(k) Disability Protection Program ("401(k) Program"), which allows disabled participants to continue making 401(k) contributions into their IBM Savings Plan accounts, and the IBM Long-Term Disability Plan ("the Plan"), which provides long-term disability insurance coverage. (*Id.* 1151, 1344-1407.)

MetLife is the named fiduciary of the Plan and is responsible for providing "full and fair review of claim denials pursuant to Section 503 of ERISA." (*Id.* 1253.) MetLife also administers claims for the Plan and 401(k) Program. (*Id.* 1204, 1376.) As the Plan fiduciary, MetLife has

> discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(*Id.* 1253.)

To receive benefits under the 401(k) Program or the Plan, a participant must be "disabled." Both the Plan and the 401(k) Program define "disabled" the same way:

> Disabled or Disability means that, due to Sickness or as a direct result accidental injury:
>
> - You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
>
> - You are, during the Elimination Period and the next 12 months of Sickness or accidental injury unable to perform each of the material duties of Your Own Job; and
>
> - You are, after such period unable to perform the duties of any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

(*Id.* 1317, 1366.)  To qualify for benefits, a participant must provide written evidence to the administrator that he has satisfied all conditions and requirements for benefits described.  (*Id.* 1319, 1368.)  If a participant qualifies as disabled, the Plan pays monthly benefits at a rate of "50% of Your Predisability Earnings[.]"  (*Id.* 1363.)  The 401(k) Program pays "1/12th of: Your Before-Tax Deferrals and/or Your Employer Matching Contributions . . . made to Your IBM Savings Plan account for the calendar year immediately preceding the calendar year in which you become Disabled; and which You elected to include for purposes of determining the 401(k) Disability Protection Program Benefit."  (*Id.* 1194.)

## II.      Merchant's Health Problems

### A.      Onset of Merchant's Pain and Benefits Claim

In August 2011, Merchant underwent a cardiac catherization and coronary angiogram. (*Id.* 990.)  After the procedure, Merchant had pain in his right groin, thigh, abdomen, and back. (*Id.* 993.)  He visited the Loyola Maywood Pain Management Clinic on August 22, 2011, and the physician who saw him ordered a CT scan, which showed no evidence of internal abdominal bleeding.  (*Id.* 643.)

On August 29, 2011, Merchant stopped working at IBM temporarily because of the pain. (*Id.* 1026.)  He returned to work on November 23, 2011, but ceased work entirely on December 9, 2011.  (*Id.*)  His short-term disability benefits were set to expire on February 27, 2012.  (*Id.*)  On January 26, 2012, he submitted a claim for long-term disability benefits and 401(k) plan protection.  (*Id.* 1070-81.)  The form he included with his claim asked him to describe what prevented him from performing the duties of his job.  (*Id.* 1071.)  He listed, "Ability to drive, walking, standing and sitting."  (*Id.*)

## B.   Late 2011 and Early 2012 Medical Treatment

Shortly before he ceased working, on December 6, 2011, Merchant was seen by a physician who noted that Merchant described his current pain level at eight, nine at its worst and six on average.[4]  (*Id.* 1013.)  He also stated that his back and buttocks pain increased with sitting, and that his leg and heel pain worsened with walking.  (*Id.*)  The next day, Merchant had an MRI.  (*Id.* 641.)  The physician who interpreted the MRI noted Merchant's "mild broad-based disc bulge, ligamentum flavum hypertrophy,[5] and bilateral facet arthropathy."[6]  (*Id.*)  The physician also noted Merchant's mild congenital spinal stenosis, which was most advanced at L3-4 and L4-5.[7]  (*Id.*)

Merchant saw physical medicine and rehabilitation physician Dr. Prempreet S. Bajaj and his resident/fellow, Dr. Samuel Yoakum, on December 12, 2011.  (*Id.* 945-46.)  Dr. Yoakam wrote that Merchant's right groin pain was likely caused by nerve damage in a nerve passing from his lumbar to his leg, but could also be tied to hip pain, as his hip exam showed potential arthritis.  (*Id.* 946.)  Dr. Yoakam discussed physical therapy and other interventions with

---

[4]  The parties dispute whether Merchant saw Dr. Michael Gill or Drs. Samuel Yoakum and Prempreet S. Bajaj on December 6, 2011 and who recorded these notes.  This dispute is not material and does not prevent the court from granting summary judgment.

[5]  "Ligamentum flavum hypertrophy is a degenerative condition of the spine which most commonly occurs in the elderly where the tendons holding one vertebra to another thicken, decreasing the amount of room available for the spinal cord and the nerves that come off it. It may be associated with inflammation (arthritis) or osteoporosis."  Answers.com, "What Is Ligamentum Flavum Hypertrophy?" available at http://www.answers.com/Q/What_is_ligamentum_flavum_hypertrophy (last visited August 25, 2014).

[6]  "Facet joint arthropathy refers to a degenerative disease that affects the joints of the spine and the disintegration of cartilage on those joints."  Laser Spine Institute, "Facet Joint Arthropathy," available at http://www.laserspineinstitute.com/back_problems/facet_disease/articles/facet_joint_arthropathy/ (last visited August 25, 2014).

[7]  "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine."  Mayo Clinic, "Spinal Stenosis," available at http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited July 14, 2014).

Merchant, whom he noted was "in significant pain and [would] likely benefit from an epidural injection before beginning therapy so that he [could] tolerate the therapy better." (*Id.*) On that same day Merchant also saw his internist, Dr. Michael Gill, who noted that Merchant was "[s]till bothered by a lot of pain [in his] low back but also groin" and that Merchant wanted to work from home but was unsure IBM would allow for that. (*Id.* 941.)

Merchant saw Dr. Gill again on January 4, 2012. (*Id.* 929-30.) Dr. Gill noted that Merchant said he had pain all over the right side of his body that was so severe that he could not sit or stand for long, walk through a store, or sleep in the same room as his wife. (*Id.* 929.) Dr. Gill observed that "[o]bjectively there is a mismatch in the degree of pain he describes (at least the dysfunction it is causing) and his appearance," as Merchant remained "sitting in the same position" and did "not particular[ly] appear uncomfortable" when Dr. Gill manipulated his legs. (*Id.* 930.)

Merchant saw Dr. Bajaj again on January 9, 2012 to follow up on a lumbar epidural he had received on December 21, 2011. (*Id.* 924-25.) Dr. Bajaj reported that Merchant stated his sources of pain had not changed but that his situation was worse because his daily activities were restricted by pain. (*Id*. 924.) They discussed possible treatments, such as acupuncture and entering a 30-day pain clinic program, but decided not to do either and continue considering the options in the future. (*Id.* 925.) Dr. Bajaj noted that Merchant was "significantly focused on his pain" and that his pain was "constantly on his mind and [ ] dominating his entire life." (*Id.*) While Dr. Bajaj found that Merchant's pain was real, he observed that Merchant needed to find a way to take focus off his pain. (*Id.*) Dr. Bajaj also completed a Medical Treatment Report for Merchant. (*Id.* 1024.) He found that Merchant was *not* "totally impaired for work" but had to change positions frequently and was unable to sit for longer than 20 minutes at a time. (*Id.*) A

week later, Dr. Bajaj completed another form for Merchant in connection with Merchant's application for long term disability benefits. (*Id.* 1078-80.) He indicated that Merchant had some limitations walking, standing, sitting, and completing other tasks such as reaching and bending over. (*Id.* 1079.) He wrote that Merchant had a "slight limitation of functional capacity" and was "capable of light work." (*Id.* 1080.) Dr. Bajaj marked that Merchant was not totally disabled, but he could not determine when Merchant would be able to resume normal work activities. (*Id.*)

On January 25, 2012, Merchant saw an integrative medicine physician, Dr. Kit Lee, for his pain. (*Id.* 907-08.) Dr. Lee noted that the underlying causes of Merchant's back and thigh pain were unclear but could be due to nerve irritation at his groin from his hip and lumbar stenosis. Dr. Lee suggested physical therapy, stress management, and acupuncture.

In January 2012, Merchant also saw Dr. Rani Rao at the Loyola Dizziness and Balance Clinic in January 2012 for dizziness. (*Id.* 727-732.) Dr. Rao thought there might be a connection between Merchant's dizziness and different medications he had taken. Merchant also complained of episodes of "freezing spells, when his entire body feels motionless," which Dr. Rao posited may be tied to catatonic depression. (*Id.* 732.) At a follow-up appointment with Dr. Gill on February 8, 2012, Merchant again described "almost catatonic like episodes," which Dr. Gill suspected to be tied to depression. (*Id.* 903.) Dr. Gill referred Merchant to a psychiatrist, Dr. Aparna Sharma, whom Merchant saw on February 29, 2012. (*Id.* 688.) Dr. Sharma noted that Merchant had a history of depression that had worsened over the past two months.

On March 6, 2012, Merchant saw a neurologist, Dr. Michael Merchut, about his pain in his right thigh and groin that radiated to other parts of his body. Dr. Merchut suspected a nerve

lesion but no EMG techniques were available to test this hypothesis. (*Id.* 685.) Merchant underwent a CT scan on his chest, abdomen, and pelvis on March 7, 2012. (*Id.* 716.) The radiologist noted some "fatty infiltration of the liver" but that it was "otherwise, unremarkable." (*Id.* 717.) Later that month, Merchant returned for a visit with his psychiatrist, Dr. Sharma, and brought his wife to the appointment. (*Id.* 680-81.) While Dr. Sharma noted that Merchant still had "pain issues," Merchant's wife reported that he was "more alert, more active, not catatonic episode, mood has improved." (*Id.* 681.)

C.  **Post-March 2012 Treatment**

As will be discussed further below, MetLife denied Merchant's claim for long-term disability and 401(k) benefits in March 2012. (*Id.* 863-66.) After the denial, Merchant continued to see a string of physicians. On April 2012, he saw an internist, Dr. Sameer Naseeruddin, who noted that Merchant said he was "unable to work secondary to pain/driving." (*Id.* 521.) A pain management physician who examined Merchant in May 2012, Dr. Mohammad Ahsan, noted that Merchant complained of right-side groin and lower quadrant pain, which Merchant reported was "getting worse." (*Id.* 634.) Merchant reported that walking, sitting, and any physical activity aggravated his pain. Dr. Ahsan initially recommended a nerve anesthetization procedure but later that month referred Merchant for physical therapy and another visit with his psychiatrist, Dr. Sharma. (*Id.* 633.) In July 2012, Merchant was evaluated by a physical therapist who noted Merchant's poor tolerance to therapeutic exercises, decreased right-side strength, and pain. (*Id.* 528.) The physical therapist recommended eight sessions of therapy for Merchant. Merchant attended four sessions and then cancelled the remainder due to the co-pay. (*Id.* 527.) At his last session, Merchant reported that he had no changes in his symptoms and that his pain persisted. (*Id.* 526.)

Merchant went to the emergency room on August 3, 2012, complaining of pain. (*Id.* 504.) An MRI of Merchant's lumbar spine in September 2012 showed some irregularity consistent with his December 2011 MRI but none that correlated with his pain due to his catherization procedure. (*Id.* 500.)

Merchant met with another neurologist, Dr. Vipan Gupta, in October 2012, complaining of "unrelenting" chronic right leg pain. (*Id.* 629.) Merchant did not want to take any new medications, so Dr. Gupta told him that he had no other options and that surgery would be inappropriate. (*Id.* 631.) He suggested Merchant revisit the pain clinic.

### III. Merchant's Disability Claim

#### A. Initial Claim

##### 1. Information Provided to MetLife

Merchant stopped work temporarily from August 29, 2011 until November 23, 2011. He ceased working entirely on December 9, 2011. On January 26, 2012, Merchant submitted a claim for long-term disability benefits under the Plan and 401(k) Program. (*Id.* 1070-81.) He wrote that his injury that prohibited him from working was due to "performing angiogram in hospital." (*Id.* 1071.) In describing "what prevents [him] from performing the duties of [his] job," he wrote, "Ability to drive, walking, standing and sitting . . . my hip, back, t[h]igh, right side of body." (*Id.*) He attached the January 16, 2012 statement from Dr. Bajaj.

On February 1, 2012, a long term claim specialist for MetLife, Tammy Crawford, spoke with Merchant over the phone about his disability. (*Id.* 6-9.) Merchant told Crawford that his pain was caused by his 2011 angiogram. He also noted the limitations he experienced due to his "extreme pain," such as his problems sleeping or walking long distances, and sitting for more than 30 minutes to one hour at a time before he had to lie down. (*Id.* 6, 8.) He also explained to

Crawford that his job in Iowa was a three-hour drive from his home, so he would stay in Iowa for the week and then return home on the weekend. His request to work from home was denied so Merchant said he "had no choice" but to apply for disability benefits. (*Id.* 7.)

MetLife obtained Merchant's Medical Treatment Report forms that his physicians had completed between August 3, 2011 and January 9, 2012 in connection with his short-term disability claim. In many of these assessments, Merchant's physicians said that he *was* totally impaired for work. Dr. Lewis said he was totally impaired on August 23, 2011, with the explanation of "Unable to drive re: vertigo. Unable to walk any significant distance re: neuropathy." (*Id.* 989.) On September 26, 2011, Dr. Gill wrote that he was totally impaired for work with a note stating, "not safe to drive." (*Id.* 1003.) Dr. Gill also noted that he was unable "to ambulate, stand long periods." (*Id.*) Dr. Bajaj said Merchant was totally impaired for work on December 12, 2011, because of pain secondary to his lumbar radiculopathy and inguinal neuropathy. (*Id.* 1005.) And Dr. Gill again said Merchant was unable to work on January 3, 2012, due to his inability to sit or stand for long periods of time due to his pain. (*Id.* 1011.)

On other assessments, Merchant's physicians noted that he was not totally impaired for work and could return to work at some point. Dr. Mauro Montevecchi, a cardiologist, said on August 3, 2011, that Merchant could return to work August 22, 2011. (*Id.* 986.) On August 12, 2011, Dr. Lewis said Merchant could return to work December 1, 2011. (*Id.* 987.) On December 5, 2011, Dr. Gill reported that Merchant was not totally impaired for work. (*Id.* 1004.) And on January 9, 2012, Dr. Bajaj said Merchant was not totally disabled and that he could work with "frequent changing of positions," as Merchant was "unable to sit, drive for longer than 20 minutes [without] resting and changing positions [with a] 5 min[ute] break to stretch." (*Id.* 1024.) That Dr. Bajaj had determined Merchant could return to work on January 9,

2012, if he could frequently change positions was at some point communicated between MetLife's claim specialist, Crawford, and Merchant's supervisor at IBM, Carriker. (*Id.* 11-12.)

Crawford spoke with Merchant's supervisor, Carriker, in mid-February. Carriker told Crawford that Merchant could not work from home because his performance was "on the lower end of the veterans" and IBM does not generally allow employees to work from home. (*Id.* 13.) Carriker also told Crawford that Merchant's job involved no travel and that Merchant was free to "get up and walk" around during the day. (*Id.*) Later that day, Crawford spoke with Merchant himself to ask what prevented him from working. Merchant said that he could not drive due to his pain. (*Id.* 14.) According to Crawford's notes, Merchant repeated that "he could not work as he could not work from home." (*Id.*) Merchant's wife also spoke with Crawford and advised that Merchant had "severe depression due to the pain and everything going on." (*Id.* 15.)

At Crawford's request, IBM and Carriker provided MetLife with descriptions about Merchant's duties. (*Id.* 957-60, 967.) IBM reported that Merchant's job involved sitting for seven to eight hours per day and standing for one to two hours per day. It did not involve walking, driving, or traveling. (*Id.* 958.)

## 2. Claim Determination

MetLife sent Merchant a letter dated March 19, 2012, denying his claim for benefits under the Plan and the 401(k) Program. (*Id.* 863-66.) The letter outlined the assessments of Merchant's various physicians and concluded that Merchant was

> not disabled from doing the important duties of your regular job with IBM. . . . You and your health care providers indicated you would be able to perform your job from home, and you would need to make frequent position changes and be allowed to take 5 minute breaks to stretch. MetLife confirmed with your employer they would be able to accommodate at work from home arrangement. Since your job does not require you to travel, a work from home accommodation is not required to do the duties of your own job.

(*Id.* 865.)  MetLife also stated that it had considered Merchant's depression but "there were no clinical findings or supportive medical documentation submitted to support your inability to perform the duties of your own job due to a psychological condition."  (*Id.*)  The letter advised Merchant that he could appeal the determination within 180 days.

### B.     Merchant's Appeal

Merchant retained counsel and submitted his administrative appeal on September 14, 2012.  (*Id.* 667-74.)  His appeal included records from his treating physicians and Adventist Glenoaks Hospital.  Merchant submitted additional records throughout the fall from Dr. Naseeruddin and from his physical therapist, Ferdie Nazal, along with results of other tests that Merchant had performed.   MetLife's medical director of claims, Dr. Joseph Monkofsky, reviewed the evidence and arguments Merchant's attorneys presented and decided to refer the file to MetLife's physical and psychological medical directors.  (*Id.* 56-66.)  MetLife's appeals nurse, Rosanne Lombardi, also reviewed Merchant's appeal and concluded that the information provided "does not appear to support incapacity on the Physical end."  (*Id.* 66.)  She recommended that a neurologist review the file.  (*Id.*)

Accordingly, MetLife consulted a board-certified neurologist, Dr. Dianne Wolf, who prepared Physician Consultant Reviews on November 6 and November 14, 2012.  (*Id.* 461-77, 589-604.)  Both discuss assessments by Merchant's physicians, some of whom were in contact with Dr. Wolf as she prepared her reports.  For example, Dr. Wolf consulted by telephone with Dr. Gupta, a neurologist Merchant had seen on October 19, 2012, who informed Dr. Wolf he thought Merchant was unable to work due to uncontrolled pain.  (*Id.* 599).  If Merchant's pain were controlled in the future, he could "do a desk job."  (*Id.*)  Dr. Wolf concluded that Merchant's functional limitations were "no prolonged sitting or standing" and that he should be

allowed to change positions as needed, as he could only sit for ten minutes before needing to change positions.  (*Id.* 473.)   She went on to state that "beyond October 19, 2012 the claimant would not have been able to function in the workplace due to pain per my discussion with Dr. Gupta."  (*Id.* 474.)

MetLife also considered Merchant's depression and related medications, and consulted with physicians regarding Merchant's psychological issues.  MetLife's psychiatric medical director, Karen Meissler, Psy.D., evaluated Merchant's records and opined that "the psychiatric medical information is not sufficient to support severity of functional limitations due to the psychiatric condition(s) for the continuous period under review beyond . . . 12/09/2011 thru . . . 2/28/12 onward."  (*Id.* 80.)  She concluded that "the treatment perceived during the time period specified is not consistent with a level of symptom severity that would preclude work functioning due to a psychiatric impairment."  (*Id.* 82.)  She recommended further evaluation by an independent psychiatrist, and MetLife thus consulted board certified psychiatrist Dr. Mimi Thein, who prepared a Physician Consultant Report dated November 7, 2012.  (*Id.* 451-60.)   Dr. Thein reviewed Merchant's medical records and spoke with his physicians, including his psychiatrist Dr. Sharma.  Dr. Thein concluded that Merchant experienced severe, continuous functional limitations between February 8, 2012 and March 21, 2012, based on Dr. Gill's decision on February 8, 2012 to refer Merchant to Dr. Sharma, and Dr. Sharma's note from March 21, 2012 that Merchant had progressed.  (*Id.* 459-60.)  Other than this period, however, "the medical documentation and telephonic interviews with Drs. Sharma, Ahsan and Naseeruddin do not support that claimant to be experiencing severe, continuous, psychiatric functional limitations on or around 12/10/11 and through the present."[8]  (*Id.* 460.)

_____

[8]  Although Merchant's primary complaints were  about his lower back, groin, and thigh pain, MetLife MetLife requested a physical medicine and rehabilitation physician, Dr. Lucia McFee, to prepare

On December 3, 2012, MetLife sent these reports to Merchant's treating physicians, Drs. Merchut, Sharma, Rao, Lee, Bajaj, Lewis, and Gill. (*Id.* 191-92; 227-28; 263-64; 299-300; 335-36; 371-72; 407-08.) MetLife asked each of the physicians to submit comments on the reports by December 16, 2012, specifically addressing Merchant's functional limitations, and to submit evidence if the physicians disagreed with the reports. None responded. (*Id.* 151.)

On December 17, 2012, MetLife sent Merchant's attorneys a lengthy letter upholding the original denial of Merchant's claim for disability benefits ("the Denial Letter"). (*Id.* 142-54.) MetLife explained,

> Although some functional limitations were supported by the medical information provided, the medical information provided did not demonstrate that Mr. Merchant was unable to perform the important duties of his regular job with IBM for the continuous time period beyond December 9, 2011, so the definition of disability was not satisfied.

(*Id.* 142.) MetLife concluded that Merchant could not perform his duties from February 8, 2012 until March 21, 2012, and again after October 18, 2012, but because he "was not disabled as defined by the Plan beyond December 9, 2011, and there was no return to active work beyond December 9, 2011, Mr. Merchant was not eligible for [long term disability] benefits[.]" (*Id.*) The letter went on to discuss Merchant's medical records and the conclusions of the physicians MetLife had engaged to examine Merchant's medical history. It noted that Merchant had the following functional limitations from December 10, 2011 until October 18, 2012: (1) maximum time for sitting before changing positions was ten minutes; (2) maximum time for standing

---

another Physician Consultant Review of Merchant's file limited specifically to Merchant's shoulder, neck, and upper back pain, which she did on November 27, 2012. (*Id.* 478-83.) Dr. McFee analyzed Merchant's medical records and attempted unsuccessfully to contact some of Merchant's physicians. She concluded that the medical information "does not support functional limitations due to neck, shoulder or upper back pain on or around 12/10/2011 onward." (*Id.* 482.) She noted that Merchant had felt that his upper body pain was related to his lower body pain, but that "there is no indication in the file that these complaints would support physical functional limitations for the time period in question." (*Id.*) She concluded that there was no clinical evidence to support restrictions or limitations resulting through medications that Merchant was taking for his neck, shoulder, or upper back complaints. (*Id.* 482-83.)

before changing position was thirty minutes; and (3) standing and walking were limited to a total of two hours intermittently in an eight hour day, but that Carriker confirmed that IBM could accommodate Merchant's need to stretch and change positions while performing his job duties. (*Id.* 151, 153.)

**ANALYSIS**

**I.      Standard of Review**

Where an ERISA plan confers on its administrator discretion to construe the plan's terms, the court reviews the administrator's decisions under the arbitrary and capricious standard. *See Jenkins* v. *Price Waterhous Long Term Disability Plan*, 564 F.3d 856, 860-61 (7th Cir. 2009) (citing, *inter alia*, *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)); *Wetzler* v. *Ill. CPA Soc'y & Found. Ret. Income Plan,* 586 F.3d 1053, 1057 (7th Cir. 2009). In conducting this review, however, the court must "remain cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Jenkins*, 564 F.3d at 861 (quoting *Met. Life. Ins. Co.* v. *Glenn*, 554 U.S. 105, 108, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)). This conflict is to be weighed as a factor in determining where there has been an abuse of discretion. *Glenn*, 554 U.S. at 115. The presence of this conflict can "act as a tiebreaker" in "borderline" cases. *Jenkins*, 564 F.3d at 861 (quoting *Glenn*, 554 U.S. at 117). But "[a] conflict of interest . . . is a given in almost all ERISA cases," and courts must look not just to the conflict itself "but the *gravity* of the conflict." *Marrs*  v. *Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009) (emphasis in original).

At the outset, the court must resolve the deference that it should give to MetLife's benefits denial. While Merchant recognizes that the general standard of review in cases such as

this is arbitrary and capricious, he urges the court to examine MetLife's actions more closely given its conflict of interest as both arbiter of claims and payee under the Plan. But other than the existence of a structural conflict inherent to many ERISA plans, Merchant presents no evidence that MetLife's determination was biased because it would have to pay out Merchant's benefits. It is undisputed that the Plan language gives MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits," and reviewing claim denials. (R. 1253.) So, while the court remains mindful of the structural conflict, it applies the arbitrary and capricious standard of review.

Under the arbitrary and capricious standard, a plan administrator's decision should not be overturned as long as (1) "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome," (2) the decision "is based on a reasonable explanation of relevant plan documents," or (3) the administrator "has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Hess* v. *Hartford,* 274 F.3d 456, 461 (7th Cir. 2001) (quoting *Exbom* v. *Cent. States, Se. & Sw. Areas Health & Welfare Fund,* 900 F.2d 1138, 1142-43 (7th Cir. 1990)). A decision is reasonable if the plan administrator "consider[ed] the factors that are relevant to the important aspects of the decision, and articulate[d] an explanation that makes a 'rational connection' between the issue, the evidence, the text and the decision made." *Schaub* v. *Consol. Freightways, Inc. Extended Sick Pay Plan,* 895 F. Supp. 1136, 1140 (S.D. Ind. 1995) (citing *Cuddington* v. *N. Ind. Pub. Serv. Co.,* 33 F.3d 813, 817 (7th Cir. 1994)). "ERISA requires that specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator." *Hackett* v. *Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 774-75 (7th Cir. 2003) (quoting *Halpin* v. *W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir. 1992)).

**II.**     **Whether The December 17, 2012 Denial Of Benefits Was Reasonable**

Both the Plan and the 401(k) Program provide that to be entitled to benefits, Merchant had to be "disabled" during the "elimination period," which began the day Merchant stopped working, and for 12 months thereafter.  (R. 142-43.)  Thus to qualify for benefits, Merchant had to show he was disabled continuously after December 9, 2011.  MetLife found that Merchant was unable to perform his job from February 8, 2012 through March 21, 2012, and beyond October 18, 2012, but otherwise was able to work.

**A.**     **Whether MetLife Adequately Considered Merchant's MRIs and Complaints**

Merchant argues that MetLife failed to adequately consider Merchant's complaints of back pain, December 2011 MRI, and September 2012 MRI.  In particular, he points to the complaints he made to Drs. Gill, Bajaj, Yoakum, Lee, Ahsan, and Gupta, and his diagnosis of lumbar spinal stenosis.  Merchant also points to the lumbar spine MRI he underwent in December 2011 that found disc bulge and stenosis and the September 2012 MRI, which he showed almost identical issues.  (Pl. 56.1 ¶¶ 7, 25; dkt. 36 at 7 (citing *Black & Decker Disability Plan* v. *Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034)).

ERISA "does not appear to require the plan to identify each and every piece of evidence that it relied upon in reaching its decision to deny benefits."  *Marantz* v. *Permanente Med. Grp., Inc. Long Term Disability Plan,* 687 F.3d 320, 328 (7th Cir. 2012).  But the plan must still "provide a reasonable explanation for its determination and must address any reliable, contrary evidence presented by the claimant."  *Love* v. *Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009) (citations omitted).  Here, MetLife did not adequately address the opinions of Merchant's treating physicians from around the time he stopped working, many of whom opined that he was totally impaired for work.  Just three days before he ceased working,

one of his physicians noted that Merchant described his pain level at eight and explained that it was a nine at its worst and a six on average. (R. 1013.) The day after Merchant stopped working, Drs. Bajaj and Yoakum diagnosed Merchant with spinal stenosis. Days later, Dr. Bajaj found that Merchant was totally impaired for work. (R. 1005.) Dr. Gill wrote on January 3, 2012, that Merchant was unable to work due to his inability to sit or stand for long periods of time because of pain.[9] (*Id.* 1011.) The Denial Letter fails adequately to discuss evidence of Merchant's pain in the time period immediately after Merchant stopped working.[10] (R. 144.) Merchant was entitled to a full and fair explanation of why benefits were denied and this explanation must include the evidence demonstrating Merchant was disabled when he stopped working.

The letter also does not adequately consider Merchant's December 2011 MRI. The results of that MRI show his bulging disc and stenosis, results that were largely repeated in his September 2012 MRI. This indicates that Merchant's condition had not changed—and, if anything, had deteriorated—from the time that he was supposedly able to work. While it is true, as MetLife argues, that MRI results "merely aid[ ] the diagnosis" of a disability, and do not definitively prove the disability itself, *Houston* v. *Provident Life & Accident Ins. Co.*, 390 F.3d 990, 996 (7th Cir. 2004), they are also relevant medical evidence that the Plan must take into account. *See, e.g., Mirocha* v. *Metro. Life Ins. Co.*, -- F. Supp. 2d ----, No. 13 C 5724, 2014 WL 3558747, at *7 (N.D. Ill. July 18, 2014) ("Though MetLife may not have been compelled to find

_____

[9] Just a month before, on December 5, 2011, Dr. Gill opined that Merchant could return to work. The change in his opinion indicates that Merchant had deteriorated. Although Dr. Bajaj believed Merchant was not totally impaired for work on January 9, 2011, other physicians offered conflicting opinions. Further, Dr. Bajaj believed Merchant could only return to work with certain modifications, such as Merchant being allowed to change positions every 20 minutes and taking five minute breaks to stretch. (*Id.*)

[10] Indeed, there is little more than a fleeting reference in the discussion of Dr. Wolf's review to December 2011 notes from Merchant's physicians. (R. 149-50.)

a disability on the basis of this [MRI and other medical] evidence, it could not arbitrarily refuse to credit the evidence given its apparent reliability.  But that is exactly what MetLife did.").  Furthermore, while the Denial Letter's discussion of the September 2012 MRI notes that the disc bulging at L4-5, the discussion of the December 2011 MRI does not.  (R. 150.)  Although MetLife claims that it considered all relevant medical evidence, its omission of these assessments is worrisome.  *See Love*, 574 F.3d at 396-97 (Seventh Circuit "troubled" by plan's failure to discuss plaintiff's treating physicians' conclusions, MRI, and other test results).  Merchant's argument that the Plan did not provide him with a full and fair review of his disability claim based on its failure to consider notes from December 2011 and January 2012 is well-founded.[11]

**B.  Whether MetLife Adequately Considered Dr. Wolf's Opinion and Merchant's Job Description**

Merchant also argues that the Denial Letter was deficient for ignoring the restrictions identified by Dr. Wolf, the neurologist MetLife engaged to consult on Merchant's appeal.  Merchant contends that, given the restrictions set forth by Dr. Wolf, he could not perform the tasks required by his position, even with the accommodations IBM was willing to make.  MetLife asserts that Merchant takes too narrow of a view of potential accommodations IBM would have made for him.

In determining whether an employee seeking ERISA benefits is unable to perform his job, it is reasonable to consider accommodations that the employer is willing to make.  *See Ross* v. *Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1011 (7th Cir. 1998).  These accommodations, however must not be "based on hypothetical grounds," but instead "rooted

---

[11]  The court also notes that MetLife pinned much of its determination that Merchant was not disabled as of December 9, 2011 on Dr. Thein's determination that Merchant was only disabled for work from February 8, 2012 until March 21, 2012 due to his depression.  But Merchant had described symptoms that his physicians diagnosed as catatonic depression as early as January 16, 2012.  (R. 732.)  Merchant was also referred back to his psychiatrist, Dr. Sharma, in May 2012  (R. 633.)

explicitly in the precise accommodations agreed to by" the employer. *Id.*; *see also Postma* v. *Paul Revere Life Ins. Co.*, 223 F.3d 533, 541 n.4 (7th Cir. 2000) (discounting assertion that employer would have been willing to provide accommodations for employee's medical restrictions where employer admitted it would "need to consult with the clients [plaintiff] worked with before it could commit to accommodating her restrictions").

On February 14, 2012, Carriker informed Crawford that he could not accommodate Merchant working from home but he could accommodate Merchant's need to stretch and change positions every 20 minutes. (R. 12.) Carriker also advised Crawford that Merchant's job required him to "work at a desk," that Merchant could take short walks, is on the phone about 10-30% of the time and wears a headset. (*Id.* 13, 967.) In the Employer Statement Carriker completed a few weeks later regarding Merchant's job duties, he marked that Merchant's job involved sitting seven to eight hours per day, standing one to two hours per day, and no walking. (*Id.* 958.)

As MetLife noted in the Denial Letter, Dr. Wolf

indicated that beginning on or around December 10, 2011 thru October 18, 2012 functional limitations were as follows:

- Maximum time for sitting before changing positions was 10 minutes[.]
- Able to stand at one time a maximum of 30 minutes before changing positions.
- Standing and walking were each limited to a total of 2 hours intermittently in an 8 hour day.
- For the period October 19, 2012 onward there was no residual functional capacity due to deterioration and escalation of pain.

(R. 151.) MetLife did not seek information from IBM about whether it could accommodate Merchant's limitations as iterated by Dr. Wolf.

While Dr. Wolf's revised limitations were close to what Carriker said could be accommodated, they are not the same. MetLife should have conferred again with IBM in

determining whether these specific limitations could have been accommodated as opposed to presuming that they could have due to IBM's willingness to accommodate less stringent requirements. Moreover, Carriker's assessment of the hours that Merchant normally sat and stood during the day did not take into account *when* Merchant would be required to assume either position. *See Hillock* v. *Cont'l Cas. Co.*, No. 02 C 5126, 2004 WL 434217, at *5 (N.D. Ill. Mar. 2, 2004) ("However, the mere fact that [the plaintiff] spent some portion of her day sitting and some portion standing does not automatically mean that she had the power to choose *when* she did these things.") (emphasis in original). It was thus arbitrary and capricious for MetLife to assume that IBM would definitely accommodate Merchant in line with Dr. Wolf's assessments.

### C. Whether Merchant's "Disability" Was Actually His Inability to Drive Long Distances

MetLife's overriding argument is that the real problem Merchant had with his job was that it was in Dubuque, Iowa, a three-hour drive from his home in the suburbs of Chicago, Illinois. Merchant would drive to Iowa, spend the week there, and then return to his home in Illinois to see his family on the weekends. MetLife emphasizes that Merchant's position as configuration manager entailed no driving, so the fact that driving caused pain cannot support a finding of disability. *See, e.g. Storms* v. *Aetna Life Ins Co.*, 156 F. App'x 756, 759 (6th Cir. 2005) ("There may be many valid reasons for Storms' decision to live so far from work, but that decision does not render him disabled, under the terms of the Plan, simply because he cannot drive himself to work.").

It is true that on his initial application for disability benefits, Merchant listed, "Ability to drive" as what prevented him from performing his job duties. (R. 1071.) But he also listed "walking, standing and sitting," the latter two of which were part of his job description. (*Id.*) As discussed throughout this opinion, MetLife ignored evidence that Merchant was disabled.

Moreover, that Merchant wished to work from home to accommodate his disability does not prove that the limiting factor was his drive to work; there are many reasons why he would be able to find a more comfortable position to work in from his home than from his office.[12]  Given all of this evidence, MetLife's decision to deny Merchant benefits was arbitrary and capricious.

## III.     Remedy

### A.     Plan Benefits

Merchant argues that the court should find that he is entitled to benefits and grant them without remanding the case to MetLife.  But courts typically remand claims for further review rather than ordering benefits be paid.  *See Majeski* v. *Metro. Life Ins. Co.,* 590 F.3d 478, 484 (7th Cir. 2009); *Mirocha*, 2014 WL 3558747, at *8; *see also Hackett,* 315 F.3d at 776 ("In a case where the plan administrator did not afford adequate procedures in its initial denial of benefits, the appropriate remedy respecting the *status quo* and correcting for the defective procedures is to provide the claimant with the procedures that she sought in the first place.").  There are two situations in which a court itself will order benefits, (1) where the beneficiary had already been receiving benefits for a long-term disability that were abruptly cancelled, *Schneider* v. *Sentry Grp. Long Term Disability Plan*, 422 F.3d 621, 629-30 (7th Cir. 2005), or (2) where the evidence is "so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground."  *Kough* v. *Teamsters' Local 301 Pension Plan,* 437 F. App'x 483, 488 (7th Cir. 2011) (quoting *Love,* 574 F.3d at 398).

The evidence here is not as "clear cut" as Merchant insists.  (Dkt. 28 at 15.)  Nor was Merchant already receiving long-term disability benefits that MetLife stopped paying.  It is thus

_____

[12] For example, Merchant told Crawford he could not sit for long before needing to lie down (R. 8), which he could potentially do at home while working on his laptop but not at work.

appropriate to remand this case to the Plan's administrator to reconsider whether Merchant was disabled during the relevant time period.

### B.    401(k) Benefits

The final issue is whether, presuming Merchant was disabled during the relevant period, he is entitled both to Plan and to 401(k) Program benefits.  MetLife argues that Merchant did not exhaust his administrative remedies with respect to the 401(k) Program benefits.

A plaintiff claiming ERISA benefits must exhaust his internal administrative remedies before filing suit in federal court.  *See Zhou* v. *Guardian Life Ins. Co. of Am.,* 295 F.3d 677, 679 (7th Cir. 2002) (citations omitted); *Doe* v. *Blue Cross & Blue Shield United of Wis.,* 112 F.3d 869, 873 (7th Cir. 1997) ("Even without [a provision requiring exhaustion], the plaintiff, as a matter of the federal common law of ERISA, would be required to exhaust his ERISA-required internal remedies before being allowed to sue.") (citations omitted).

To demonstrate that Merchant did not exhaust his administrative remedies regarding 401(k) Program benefits, MetLife first points to Merchant's September 2012 appeal of the benefits denial.  As MetLife notes, the first line of the appeal states that Merchant is appealing "MetLife's March 19, 2012 decision to deny Mr. Mumtaz Merchant's claim for *long term disability benefits*."  (R. 667 (emphasis added).)  It does not refer to 401(k) benefits.  MetLife neglects to mention that the subject line of the appeals letter, however, contains not just Merchant's long term disability claim and group numbers, but also his 401(k) claim and group numbers.  (*Id.*)  Additionally, MetLife clearly interpreted the appeal as encompassing Merchant's arguments for 401(k) Program benefits as it addressed them in its Denial Letter.  (R. 143.)  Merchant exhausted his administrative remedies on appeal.

MetLife also argues that Merchant's complaint in this case does not assert a claim for 401(k) contribution benefits. Regardless, the definition of "disability" under both the Plan and the 401(k) is identical. (R. 1156, 1317, 1366.) Through its arguments on Merchant's eligibility for Plan benefits, MetLife effectively addresses his eligibility for the 401(k) Program benefits. *See Ghazi* v. *Fiserv, Inc.*, 904 F. Supp. 823, 827 (N.D. Ill. 1995) (although complaint did not seek benefits under disability continuation of a group policy, court would consider eligibility where plaintiff raised question in response to defendants' summary judgment motion so defendants were able to address it). The court thus overlooks Merchant's omission and directs MetLife to consider Merchant's eligibility both for Plan and for 401(k) Program benefits on remand.

## CONCLUSION

For the foregoing reasons, MetLife's motion for summary judgment (dkt. 30) is denied. Merchant's motion for summary judgment (dkt. 27) is granted. Merchant's claim is remanded to MetLife to determine whether Merchant is entitled to Plan or 401(k) Program benefits. The Clerk is directed to enter judgment vacating the Plan administrator's denial of plaintiff's claim for disability benefits and remanding the claim to the administrator for further proceedings consistent with the Court's decision.

Date:   September 3, 2014

_____

U.S. District Judge Joan H. Lefkow